Mr. Farney, let me just, just so we have the parameters correct here, there were two board decisions, as I understand, we have the original decision and then we had a reconsideration decision, correct? Yes, sir. And I assume, am I correct in thinking that it's the reconsideration decision that is really the focus of our attention here since it was the last decision and that was the final ruling? No, Your Honor, and I'd like to say that we come today to suggest that there's a narrow decision of this case is possible and I believe that the case should be reversed and remanded based on two fact-free holdings that are in the original decision and that were unchanged in the reconsideration decision. Is that before us? I thought the effect of the reconsideration decision was to supply a rationale for the decision of the board and the board, in essence, reserved its decision on the other issues that it removed. It would seem to me that if we would have to reverse the board on what I'll call the causation reliance issue, and if we were to reverse the board on that issue, which was the basis for its decision, we probably ought to remand to allow the board to then consider the issues that it found to be moved. Wouldn't that be the proper procedure? No, Your Honor, I don't think so because the reconsideration decision, what was described as moved, was the arguments that were made by the agency, which composed a large part of your brief. There's no reconsideration decision on those issues. Right, but that would have to assume that there was never any decision of any kind below in terms of what was the relevant cost or pricing data, what was the alleged defective data, and you can't even have a reliance analysis without a starting point. And I think that, if I could just be permitted to lay this out for just a couple minutes. Basically, what we're saying here is that the two factors that are at issue in this case, one, that there is no obligation to use current and accurate data in the proposal, and two, that there is no statement in the BAPO that can be cost or pricing data. Those are two decisions. If you look at those pages, you can scour those pages, you will not find any kind of fact. Those are pure questions of law. At least the data were not factual, that there was intentional misrepresentation, or a lot of the other issues which could, according to the board, but did not affect the result. That is, I agree, rather a sweeping statement. But you're asking us to take that statement out of context, and the board actually put it in the context of the issues that were presented to them in this particular case. Well, I know that that's argued by United Technologies in their brief, but that's not in fact the case. In other words... Well, that's one of the questions before us. Right. The board mentions judgment and judgmental factors. It doesn't say that, for example, Schedule C or Schedule A were too judgmental. It doesn't say that. It just says, with regard to BAPO, no BAPO statements can be cost or pricing data. The reason... I want to try and tie together my reasoning here on the definition and the The question is the starting point for reliance. If you are going to start with trying to see causation from the figures that are provided to the government, the amount, which is really the nut of all the schedules. In other words, DCA went through and said, these amounts are not the current and accurate amounts. If you start your causation reliance argument from that defective data, what was told to the government, it's easy to see reliance. It's easy to see causation. And in fact, in the first decision, that was the analysis that the board made. If you look at pages 35 and 36, you'll see. Very common sense. Look, they went out, they did a big audit, they asked questions about it, they said they wrote it up, they said they were relying on this stuff. A very easy analysis. Where the board got That wasn't the BAFO. That was the pre-BAFO, the initial. This is the testimony of Mr. Wyatt and Mr. Hensman, right? No, I was describing the decision, the first decision. I was describing what the board said. The first decision is not in front of us. The reconsideration decision is in front of us. But what I'm trying to explain is the importance of the definition of the defective data to the causation argument. What happened here is But don't you concede that the data was disclosed? On page 15 of your reply brief, we admit that you revealed the most recent quotes prior to the board. Right. The question is not what's disclosed. The question is what's submitted. What is identified as the current, accurate, and complete data. What's the difference between, you say, submitted? Right. Under the regulations, you have to submit. In other words, you have to identify what is the data that's the most current, the most accurate, the most complete. And that, in those days, was put on the form DD-633. This is what You're saying it's irrelevant whether it was relied upon. Is that right? Isn't that really the heart of what you're saying? The question most properly is whether it caused an increase in price. But this is what I would suggest to you today. If the case remains as I think it must be for those two improper definitions of the cost of pricing data, let the board do the causation reliance analysis again. We're confident that they're going to come up with a different result. And I want to explain how they got sidetracked. You're asking for a remand now. Your briefs ask for a reversal. Have you shifted your ground on the relief you want? I think that's sufficient. I mean, yes or no? Your brief says reverse. You want the board to be reversed. We're not asking for an order that says that we are entitled. What we're asking for is to vacate the decision below. Why doesn't your brief say that? Isn't the other side entitled to know before they come here to know what the relief is you want? Well, it's always been clear that we sought a remand because there was never any... Where in your brief do you use the word remand? If I were to word search your brief and look for the word remand, I will not find it. Well, that... That's correct. Okay. I trust you. You're right. But let's put it this way. It was always clear, I think, from the context of my brief that remand was necessary because there was never any finding below with regard to causation or damages, another word, with regards to... What do you mean there was no finding? That was the whole thrust of the reconsideration decision. No reliance. Right, but... But they said there was no causation, there was no reliance. What I'm saying is that if that's reversed, there's no existing finding as to damages like there are for the other four categories, B, D, F, and H. You don't need damages if there's no causation. If there's no causation, sir, because there's no reliance, then TINA doesn't apply. It just falls off the table. Am I correct about that? If there is no causation, then TINA doesn't apply. The case is over. Because TINA says if you provide defective data and it causes a price increase... Can you answer my question yes or no? If there's no causation... What I'm saying is, in my brief... And we have a fact-finding by the board that there's no causation. Right. Correct? No. Reconsideration decision. Isn't that what that is? I don't believe that they found that no price increase was caused. They said there was no reliance. They said there was no reliance. That's the key on the causation. Right, and I put in my brief why I think that the legal standard that they applied is wrong. Well, if we disagree with you on that, if we disagree with you on your take on what the legal standard is, then don't you lose for sure? No. Why not? Because the board, in considering the four areas that they found defective data, focused on the wrong defective data, and this is the point. The board focused on the failure to disclose the secret decoder documents in December. The board says that's why it became defective. The reason the board focused on that is because there was an elephant in the room, and the board started talking about the mouse down the street. And when they turned around on reconsideration to talk about... to reconsider his previous ruling on reliance, he said, oh, the mouse down the street didn't cause any damages. Well, no, you can argue about whether the mouse really had any impact, but the elephant in the room... I've lost your analogy. I can't... I don't know. The mouse is... I'm trying to explain. The mouse is the secret decoder document, the Bible sheet, the things that are identified in finding 53 of the initial decision. That's the sole basis that the court relied upon to find defective data. What happened here was this company sent in $270 million worth of defective data before the offsets in their proposal. You don't have to go find the problem. The problem's sitting there. That's the elephant. But where is it? It's on form DD-633. Okay? It's in the proposal. And this is what I said. Are you arguing, Mr. Pryor, that, okay, you would say the board found non-reliance, and you accept that finding, obviously, but you would then say, but they made that finding with respect to data that they shouldn't have made the finding? Exactly. Is that what you're saying? That's exactly what I'm saying. They ignored the most important thing. The whole point of Tina is, submit us the amount. Tell us how much it's going to cost you. Now, what's the most important thing you say they ignored? You agree that there was no reliance. You agree that that finding can't stand. But the board filed it with no reliance. I believe that the reliance determination by the board became fatally twisted because he was focused on what happened when they didn't provide a Bible sheet in a supplemental data thing that was submitted in December. Well, maybe they should have put the Bible sheet in. Did you argue this before the board? Yes. And what was the response? The whole focus of what was before the board is what the DCA audit did. The DCA audit didn't go out and calculate what happened when the Bible sheet wasn't known. The DCA audit went out and looked at the proposal, the certified pricing information that's submitted to the government, and then they compared it to what was known at the time. And they found eight or ten different categories where they said this was an error, this was a mistake. And some of it led to offsets, very substantial offsets in favor of the company. But you're telling us the board made no errors of fact, only of law? I'm saying that it is sufficient to decide this case based on the legal arguments that are at pages 31 and 32. Because what happened there, those two twin holdings, alternate holdings, excluded the defective cost information that was provided to the government. It excluded the very heart of what Tina gets at, that is, what's in the proposal. And the board found that that was not relevant. That's right. And where was the error in that finding? Let me give you the exact finding and the exact error, Your Honor. On page 31, the board said, once a contractor has furnished accurate, current, and complete data and has filled its Tina obligations. In other words, it gave you the information somewhere. It's good. Where's this? That's on page 31 of the decision. That is directly contrary to an exact quote in binding precedent of this court. This is the question of whether Tina's a disclosure statute. Fundamentally, is that what you're talking about now? What's got to be disclosed? The relevant information. The information that's the basis of your proposal. That's what you have to identify. Sylvania, page 1348 says, Plaintiff has argued that mere submission of data satisfies the requirement of disclosure. This is out there somewhere. We do not agree. Government must be clearly advised of the relevant cost of pricing data. A couple of reasons. Your Honor, the statement at 31, though, is, I mean, standing alone, I don't see what's wrong with that. It says, once a contractor has furnished accurate, current, and complete data and has filled its Tina obligations. I mean, that's a very general statement. One couldn't quarrel with that. Yes, because the question is used. You have to disclose the current, accurate information in the proposal you submit to the government. That's what's certified. You don't certify that you have the information somewhere. You don't certify that it's somewhere in the tens of thousands of files listed all over the place. These are huge procurements. You have to certify that what's in your proposal is what's current, accurate, and complete. That was not done. And it should be reversed for consideration of whether the information in the proposal was current, accurate, and complete. And then let them do the beliefs of that. We're out of time. Thank you, Your Honor. Mr. Johnson. Thank you, Your Honor. Let me start, the Court, please, by summarizing UTC's view of this appeal. We believe the ASBCA correctly denied the three claims that are issued here. It was relating to Pratt's estimates of deep parts cost, ECP ad labor efficiency, and deep material escalation based on alternative grounds, citing Air Force admissions and findings of fact that are not challenged on appeal. The Board rejected, as the Court has observed, the claims based on a ground that covers all the claims that were made, and that is the finding that the government did not rely on the cost and pricing data. In fact, it relied on other legitimate factors, the independent estimate and competition for the FY85 prices and competitive forces for the dramatically different FY86 to 90 prices. Now, we also believe there was an alternative ground, which the Court, as it's observed, really doesn't need to reach, in which the Board rejected the three claims that are at issue. The Board found, with respect to those claims, that they did not involve mistakes or errors, that they involved decisions that Pratt made as to what it was going to use in its proposal, which it was perfectly legitimate to do, and which was not covered by the TINA certificate. The TINA certificate does not certify what you use. It certifies what you disclose. The Board also found that the government hadn't argued non-disclosure, hadn't contested it, made stipulations of disclosure, and the Board, all it argued was use, as you've heard again today, and the Board also made specific findings of disclosure. Mr. Johnson, doesn't Mr. Poirier take issue with you on your statement just a moment ago that the TINA certificate doesn't certify what you use, it only certifies what you disclose? It was fairly red. I thought the government was trying to challenge that proposition. I think he does, and I think he's wrong. I think the law is clear that this is a disclosure statute. The statute doesn't talk about it. I'm just trying to shape up, because I had a little trouble following the government's brief and the argument to sort of see where the two sides are in genuine conflict. I agree. Now, the Board, on this alternative ground, rejecting the claim, so there are two or three grounds of rejecting, distinguished this from those claims for which it found defects. The offsetting claims, in which it found that there were mistakes and errors, and that there was a need for further disclosure, the Bible sheet. But the Board didn't find the Bible sheet applied to the three claims now before the Board, and therefore the alternative basis for finding that there was not defective cost or pricing debt. Now, to these facts, the Board applied fundamental TINA law that's existed for over four decades. The government now wants to change that law, and it doesn't really tell you it's changing that law, but it is, radically, by eliminating reliance as an element of proof, transforming the causation analysis long established by this Court, turning TINA into a use statute, and turning legitimate judgments into cost and pricing debt. Let me begin with reliance and causation, which is dispositive in the case. There's a deep and rich record of detailed findings and admissions that we've set out in our brief of 9 to 20 that support the Board's ultimate findings of non-reliance and no causation. This is an undisputed record that shows for FY85 the priority of the Air Force's independent estimate as the Air Force position for evaluating prices. And based on that, the Air Force became concerned that the price was too low. That was resolved by the impact of competition. Thereafter, the government's decision-making, from the contracting pricing officials at Wright-Patterson to Air Force headquarters to Secretary Weinberger, was based on the benefits of competition that it was receiving. And for the out-years, the five successive annual competitions, it was more of the same, only more so. No cost and pricing debt, no reliance, dramatically reduced prices in what the contracting officer called a perpetual competition. And the Board found, based on this, forces of competition were the basis for the decision, not reliance on cost and pricing debt. So what does the government argue? It argues reliance is not an element. And it has cited 1970s cases from the Court of Claims for that proposition. Singer, Lockheed, Sylvania. But those cases all say reliance is an element, proof and connected to causation. It's obvious the government has confused the non-waivable duty of disclosure, which was addressed in those cases, with the government's discretionary decision of what to do with the data furnished. Now the government also in its brief has relied on the legislative history, but has taken certain liberties with it. The Senate report at Appendix 132 and 133 makes clear that this was an initiative of the Comptroller General in 1962 and before. And the initiative was to protect the government from inflated prices by informing it of known cost debt. I state known cost debt as a direct foe. The Comptroller General's letter... Again, this is a line of division between you and the government. If a contractor truthfully reports the correct cost data, let's assume that that would result in a contract price of $1 million, but the contractor in the BAFO says, I'm going to charge $2 million, that's okay, right? That's correct. If the government accepts the $2 million, that's just tough luck, because the government was informed that $1 million was the number. Yes. Well, I think Mr. Poirier wants to say that that's not the case, that the use of the... using incorrect numbers to make a $2 million bid would be a violation of TINA. Well... I think that's what he's trying to... That's what he's saying, but these were not incorrect numbers, and were not found, with respect to these three items, to be incorrect by the board. They were found to be legitimate decisions by the contractor, not to apply these labor efficiencies to ECP ad labor, for example, which was, as the Air Force told the DCA, consistent with Pratt's practice not to apply, or not to use these unreliable quotes that have said this is subject to corporate approval. That was a legitimate decision. Or to use the material escalation factor they picked. Obviously a prediction of inflation. Those are judgments. They're not cost and price. So there was nothing incorrect. But... Well, as to what you believe in the proper issues in front of us, there's some confusion about... I mean, Mr. Poirier thinks, I believe, that everything from the original decision is in front of us, except for the offsets and Schedule C, I guess it is, the one that they don't appeal. And your view is that there's a lesser amount of the case that's in front of us. I'm saying that he lost, the Air Force lost, low, both on the disclosure question and on the reliance and causation question. I want to make sure the court's aware of what the Comptroller General said about reliance as a factor in this legislative history. He referred to the remedy that he was proposing. And the Senate... Are you talking about the original enactment up to here? 1962. Yes, sir. Four times at A149 to 151, he described the remedy and in all situations conditioned it on reliance. Let me give you an illustration. He said the government should get, quote, price reductions any time the government has relied on pricing information furnished by the contractor. That's at 150 and 51. And then the Comptroller General entered this letter and said, I'd be glad to give you language that would meet these objectives. And the language of the statute has two crucial words. First, submit, not use. Two, the remedy is defined in terms of causation in terms of caused by data furnished by the contractor confirming that this is an information providing statute. And that furnished word leaves the question that the court has always addressed in these cases. And that is, what did the government decide to do with the information furnished? The government articulates in its brief its causation proposition. It conveniently leaves out furnished. Now the DAR at that time was totally consistent with the Sylvania analysis of causation. The 1970s cases that were cited, all of which said reliance is a part of this analysis of causation. In describing the remedy, DAR 380710A said, opened up the statement that price must be negotiated largely on the basis of cost of pricing. We know that didn't happen. Price was not negotiated on the basis of cost of pricing. And that's an established finding. And then it went on and said, you can calculate the amount of the defect, government. And that will become a natural and probable consequence number. This is the Sylvania universal restoration analysis. And it said, the government will, there's a presumption, it's rebuttable of that. The government will get that as the price reduction, quote, unless there is a clear indication that the defective data were not used or were not relied upon. We have more than a clear indication of that. We have a final finding. Now, we know the government, the Air Force went to the Congress and tried to make this same argument in effect in 1986. It complained about the reliance law that had been established by the court of claims. It said, we want this presumption to be conclusive, not rebuttal. Congress rejected that effort to change the law then, and you ought to reject the effort now. Not only rejected, didn't they enshrine the defense in the statute? Yes, sir. Let me ask you a question about that. There's been a general assumption, I think, at least hovering in the omnipresence, that the pre-'86 law governs the entirety of this contract because the contract was signed before the 86 legislation. But aren't the out-year contracts separate contracts?  FY88 through 90, those pricing actions were accepted and modified after the effective date of the 86 law. But, I think it's important as an overall matter to note that the history of that law shows that the effort was to change the existing reliance analysis. Now, the government makes a special argument. It says that, well, because the DCAA calculated the amount and the board found the amount, it's already decided causation. And it can't back away from that. Well, a couple of answers to that. A lot of answers, but some I'll offer here. First of all, calculation of quantum is not causation, it's not entitlement. It's not generally considered that. And the ASBCA clearly did not treat it as such, either in the first decision or in the reconsideration decision. It's a practical matter that DCAA invariably quantifies quantum in these cases. Well, in my hypothetical of a million contract as opposed to a two million contract, you have a quantum of excess million dollars. And if the government knows that in advance, but nonetheless accepts the contract, I assume the government has a reason to do so. As they did here. But these calculations of quantum have never been treated as causation in the case law. And one way to illustrate that is the very cases they rely on. Singer had an uncontested finding of a calculation of $227,755. Sylvania had a calculation found by the board, $239,913.75. Yet it was still necessary in those cases, as Singer explicitly said, quote, it still must be determined whether the government relied to its detriment. So all this analysis is shut out by this notion that, well, if you calculate quantum, you solve causation, which is their argument. The more I thought about it, there's a really perverse, more perverse effect of this. At most, that DCAA calculation is the most probable consequence number. That's the way DCAA, DAR defines it. You define the amount of the defect calculated. That's the natural probable consequence number. So under their construct, evidence of non-reliance would be rebutted by the natural improbable consequence number. And that has it precisely backwards under the law of this circuit. Allowing arithmetic automatically to trump proof of no reliance would make the natural and probable consequence presumption irrebuttable, contrary to universal restoration and, as universal restoration says, due process. No wonder in the government brief it suggested universal restoration may be wrong. Now when we get to the out years, these calculations aren't even good for quantum, as far as we're concerned, much less causation. Because you have these super, and we've always argued, the number zero, you have these supervening events, new prices, baffos history, cost estimates, obsolete. Clearly as performance proceeded and Pratt bought these deep parts, its estimates of the parts were outmoded. As its laborers labored on ECP, its efficiencies were there, they were not estimated, and inflation was half. So, although the government didn't care enough to find out what the breakdown of the reductions in price, or the amount of the prices it was accepting were, everyone knew, and everyone knows now, that those costs weren't the same. Okay, so we've exhausted your time. Thank you, Mr. Johnson. You've exhausted your time, but you could have two minutes of rebuttal. Thank you, Your Honor. I just want to go through briefly and address some of the points that were made, and some of the questions that Judge Klebinger had. In Sylvania, it specifically says, non-disclosure or use of inaccurate and non-current data shows a violation. In MRS, it was a case where the information was submitted, Your Honor. All of the data was disclosed. MRS said, that's not enough. They say you have to say what's significant. In this case, what happened basically on the reliance issue is, basically the board said, you failed to audit, therefore, you can't rely on the cost of pricing data. That holding is extremely damaging in the law. There's no requirement that you audit. I put in my brief a long quote from the MRS decision. It's at page 843. Directly address that. Well, if the government chooses to simply ignore the information once it's submitted, then where's the foul? This is the whole point, Your Honor. From the very beginning of TINA, the whole point of TINA was to require in these big procurements, which TINA was addressed to, what is the most relevant information, what's the most current, the most accurate, to winnow down. That's what the whole point was. They had incentive cost pricing, and you had to have a target price. From the very beginning, you submitted a proposal, and what Congress said is, we want that proposal that you do for your target pricing, we want that to be the most current, the most accurate. That's what the regs say. You have to submit the most current, the most accurate. Where the board below ran into trouble is by excluding that document, which is the statement of what's the most current and the most accurate, compounded the error by not tracing reliance from that statement of what's the most current and accurate, and instead looking to the coder documents, and that just messed up his analysis. It's very important that the agency be able to rely on the forms and the documents that say what's the most current, the most accurate. The price can be different, as you said, Your Honor, and as they said in MRS, the price can be different, the ultimate price. But the disclosure document has to be accurate. Thank you, Mr. Farrier. Mr. Johnson, case is taken under submission.